USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 11/17/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SIA PARTNERS U.S., INC.,

Plaintiff,

-against-

CHRISTINE ANDRUKONIS,

Defendant.

26 Civ. 4535 (AT)

**ORDER**

ANALISA TORRES, District Judge:

Plaintiff, Sia Partners U.S., Inc. ("Sia Partners"), brings this action against its former employee, Christine Andrukonis, alleging that Andrukonis breached multiple restrictive covenants when, upon her resignation, she accepted a new job at Korn Ferry, another consulting firm. *See* Compl. ¶¶ 43–52, ECF No. 1. Sia Partners moves for a preliminary injunction that would, *inter alia*, require Andrukonis to terminate her employment at Korn Ferry. *See* Mem., ECF No. 7; ECF No. 5 ¶ 1 (proposed order); *see also* Opp., ECF No. 12; Reply, ECF No. 13. For the reasons stated below, the motion for a preliminary injunction is DENIED.

**BACKGROUND**[1]

Sia Partners is a New York-based, global management consulting group that serves a variety of industries. Compl. ¶¶ 5, 9; Carreau Decl. ¶ 4, ECF No. 6. In 2015, Andrukonis founded Notion Consulting, Inc. ("Notion"), a change management and communications firm which, in January 2019, merged with Vienne Consulting, Inc., owned by Dianna Vienne. *See* Opp. at 2; Andrukonis Decl. ¶¶ 3–4, ECF No 11. On January 16, 2024, Andrukonis and Vienne sold Notion to Sia Partners. *See* Opp. at 3; Andrukonis Decl. ¶¶ 5–6; Carreau Decl. ¶ 6. As a

[1] Having reviewed the record, the Court recounts a factual history solely for the purpose of contextualizing its preliminary injunction ruling; except where expressly stated, this history should not be considered to constitute findings of fact.

condition of the sale, Andrukonis entered into a Restrictive Covenant Agreement with Sia Partners ("RCA"), agreeing "to be bound by certain post-termination restrictions, including three-year non-competition and non-solicitation of employees and customers provisions." Compl. ¶ 13; Carreau Decl. ¶¶ 8–9; *see also* RCA § 1(a), ECF No. 6-1. The RCA contains a provision which states that "monetary damages would be inadequate to compensate [Sia Partners] for any such breach [of the non-competition and non-solicitation provisions]" and that Andrukonis "agrees that in the event of any breach or threatened breach . . . [Sia Partners] will be entitled to seek a temporary restraining order, preliminary injunction and permanent injunction in order to prevent or restrain any such breach or threatened breach." Compl. ¶ 58 (quoting RCA § 3(a)).

On the date of the sale, Andrukonis signed an employment letter with Sia Partners (the "Employment Letter"), and she began work on February 1, 2024. Compl. ¶ 18; Carreau Decl. ¶ 10; *see also* Employment Letter, ECF No. 6-2. The Employment Letter includes "confidentiality provisions protecting the confidential information of Sia Partners, and one-year post-employment non-competition and non-solicitation of employees and customers provisions." Compl. ¶ 19; *see* Employment Letter § 10. The Employment Letter also provides that a breach of the non-compete/non-solicitation provisions "would result in irreparable injury and damage to [Sia Partners] for which [Sia Partners] would have no adequate remedy at law." Compl. ¶ 57 (quoting Employment Letter § 11). Both the RCA and the Employment Letter are governed by New York law. *See* RCA § 4(i); Employment Letter § 17.

Andrukonis' experience at Sia Partners was mixed. Andrukonis had expected to lead Sia Partners' Transformation and Change Practice, but the role ultimately went to Vienne. *See* Opp. at 3; Andrukonis Decl. ¶ 7. Andrukonis also felt that her responsibilities at Sia Partners—

"program management, change management and adoption related to AI, [and] technology and data initiatives"—diverged from her areas of interest and expertise. Opp. at 3; Andrukonis Decl. ¶¶ 5, 8. In September 2025, Andrukonis expressed her dissatisfaction in a one-on-one meeting with Sia Partners' CEO Matthieu Courtecuisse. Opp. at 4–5; Andrukonis Decl. ¶ 14. In November 2025, Andrukonis was promoted from Partner to "Chief Strategy & Growth Officer, North America." Compl. ¶ 29; Andrukonis Decl. ¶ 15. Notwithstanding the promotion, on January 20, 2026, Andrukonis informed Courtecuisse of her decision to resign. *See* Opp. at 6; Andrukonis Decl. ¶ 18. Andrukonis' last day at Sia Partners was March 13, 2026. *See* Mem. at 8; Andrukonis Decl. ¶ 24.

The parties dispute the circumstances of Andrukonis' departure. Sia Partners claims that Andrukonis did not disclose her acceptance of a job at Korn Ferry until April 20, 2026. *See* Mem. at 7–9; Carreau Decl. ¶¶ 17–19. Andrukonis states that she "communicated her plans transparently," Opp. at 9, including having an open conversation with Courtecuisse on February 6, 2026 in which Courtecuisse told Andrukonis that working at a firm such as Korn Ferry would not violate her restrictive covenants, *see id*. at 6; Andrukonis Decl. ¶¶ 19–20. Andrukonis further claims that she had a cordial meeting with Courtecuisse on March 2, 2026 during which she told Courtecuisse that she was likely to accept a role at Korn Ferry. *See* Opp. at 7; Andrukonis Decl. ¶ 22.

On May 6, 2026, Sia Partners "advised Andrukonis that it had learned of her position at Korn Ferry, had concluded that it constitutes improper competitive activity in violation of Andrukonis' restrictive covenants, and insisted that Andrukonis cease and desist" by terminating her employment at Korn Ferry. Compl. ¶ 37; *see* Carreau Decl. ¶ 25; ECF No. 6-6 (cease and desist letter). Andrukonis refused to resign. *See* Carreau Decl. ¶ 28.

Sia Partners then filed this action alleging that, by joining Korn Ferry, Andrukonis breached the Employment Letter and the RCA. Compl. ¶¶ 43–52. In addition to monetary damages, Sia Partners seeks injunctive relief and the tolling of the non-compete and non-solicitation periods set forth in the Employment Letter and RCA. *See id.* at 15. Andrukonis argues that she "is not competing with [Sia Partners], and she has fully honored her restrictive covenant obligations." Opp. at 9. Andrukonis further contends that Sia Partners is the party in breach, because it delayed payment of her 2024 bonus, failed to pay her 2025 bonus, and did not honor its repayment obligations pursuant to the shareholders' agreement which Andrukonis signed on December 13, 2024. *See id.*; Andrukonis Decl. ¶ 32; Carreau Decl. ¶ 16. Andrukonis contends that these breaches preclude Sia Partners' enforcement of the RCA and Employment Letter. *See* Opp. at 16–17.

**LEGAL STANDARD**

"A preliminary injunction is an extraordinary remedy never awarded as of right." *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 666–67 (2d Cir. 2023) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). A plaintiff seeking a preliminary injunction must establish: "(1) irreparable harm; (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party; and (3) that a preliminary injunction is in the public interest." *N.Y. ex. rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015) (internal quotation marks and citation omitted).

**ANALYSIS**

"A showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Ogunleye v. Banks*, No. 23 Civ. 9092, 2025 WL 1078301,

at *1 (S.D.N.Y. Mar. 27, 2025) (quoting *Reuters Ltd. v. United Press Int'l*, 903 F.2d 904, 907 (2d Cir. 1990) (alterations adopted)). "To satisfy the irreparable harm requirement, Plaintiff[] must demonstrate that absent a preliminary injunction [it] will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Grand River Enter. Six Nations, Ltd. v. Pryor,* 481 F.3d 60, 66 (2d Cir. 2007) (internal quotation marks and citation omitted).

Sia Partners argues that it has and will suffer irreparable harm "in the form of . . . the loss of good will and business relationships as well as the potential disclosure of its trade secrets and confidential information to a direct competitor." Mem. at 11. Having examined each of these purported irreparable harms, the Court concludes that Plaintiff has failed to meet its burden.[2]

I. Loss of Goodwill and Business Relationships

Sia Partners contends that Andrukonis "has already acknowledged and agreed that any actual or threatened breach of the restrictive covenants contained in the [] RCA or the Employment Letter constitutes irreparable injury and entitles Sia Partners to the injunctive relief it seeks." Mem. at 11. Not so. As the Second Circuit has held that "nothing in our precedents compels a district court to find irreparable harm to goodwill and client relationships in covenant-not-to-compete or -solicit cases simply because irreparable harm is often found in such cases." *Agnant*, 62 F.4th at 673; *see also Uni-World Cap. L.P. v. Preferred Fragrance, Inc.*, 73 F. Supp. 3d 209, 236 (S.D.N.Y. 2014) (quoting *Singas Famous Pizza Brands Corp. v. New York Adver. LLC*, 2011 WL 497978, at *6 (S.D.N.Y. Feb. 10, 2011), *aff'd*, 468 F. App'x 43 (2d Cir. 2012)) ("The Second Circuit has rejected the proposition that irreparable harm must inevitably be

[2] Because the Court finds that Plaintiff failed to demonstrate that it will suffer irreparable harm, the Court need not address the parties' arguments with respect to the other preliminary injunction requirements. *See, e.g.*, *Mondano v. Banks*, No. 24 Civ. 8241, 2025 WL 1984427, at *2 (S.D.N.Y. July 17, 2025).

assumed in breach of covenant cases."). Indeed, "[w]hile ex-ante acknowledgements that a party may obtain injunctive relief 'may be entitled to weight,' magic words in a contract do not alone turn what might otherwise be a 'remote' or 'speculative' injury into one that is 'actual and imminent.'" *loanDepot.com, LLC v. CrossCountry Mortg., LLC*, No. 22 Civ. 5971, 2023 WL 3884032, at *3 (S.D.N.Y. June 8, 2023) (quoting *Agnant*, 62 F.4th at 672–74). Instead, the Plaintiff "must present the district court with actual evidence" that it stands to suffer irreparable harm without the issuance of a preliminary injunction. *Agnant*, 62 F.4th at 673; *see also Hayvin Gaming, LLC v. Workinman Interactive, LLC*, No. 23 Civ. 6172, 2023 WL 3748844, at *4 (W.D.N.Y. June 1, 2023) (finding plaintiff's "sparse allegations of irreparable harm and the contractual language stipulating to irreparable harm are not enough to demonstrate that [plaintiff] is suffering any actual or imminent injury that rises to the level of irreparable harm").[3]

Sia Partners has adduced no "actual evidence," *Agnant*, 62 F.4th at 673, that Andrukonis' alleged breach has or will result in loss of goodwill or business relationships, *see, e.g.*, Carreau Decl. ¶¶ 22–28. By contrast, Andrukonis states in her sworn declaration that she has actually "recommended potential clients contact [Sia Partners] for transformation program management and execution, change management, data and AI-related implementation and adoption support services." *Id.* ¶ 27. On this record, the Court cannot conclude that Sia Partners has met its burden to show that it will likely suffer irreparable harm.

[3] The Court rejects Sia Partners' argument that there must be a presumption of irreparable harm when a restrictive covenant is executed in connection with the sale of a business. *See* Reply at 3–5. A preliminary injunction is "an extraordinary remedy," *Agnant*, 62 F.4th at 666–67 (citation omitted), and a plaintiff must come to court with evidence beyond its restrictive covenant to prove loss of goodwill and business relationships is "actual and imminent." *Id.* at 672 (citation omitted).

II. Disclosure of Trade Secrets and Confidential Information

Sia Partners contends that "Defendant has intimate knowledge and access to Sia Partners' pricing methods, clients and client preferences, customer lists, the identity of client contacts, and its HubSpot Database []— all of which qualify for trade secret protection."[4] Mem. at 14. However, the "mere exposure of an employee to the trade secrets or confidential information of a former employer does not, without more, create a threat of irreparable harm." *See Accenture LLP v. Trautman*, No. 21 Civ. 2409, 2021 WL 6619331, at *15 (S.D.N.Y. June 8, 2021); *see also Colonize.Com, Inc. v. Perlow*, No. 03 Civ. 466, 2003 WL 24256576, at *5–6 (N.D.N.Y. Oct. 23, 2003) (finding defendant's "mere knowledge of the intricacies of a business is simply not enough" to create a likelihood that defendant would disclose trade secrets which would irreparably harm plaintiff).

Sia Partners has adduced no evidence that Andrukonis disclosed its trade secrets and confidential information to Korn Ferry. *See* Mem. at 11 (complaining only of "potential disclosure"). Nor has Sia Partners pointed to suspect actions taken by Andrukonis prior to her departure that would allow the Court to reasonably believe that Andrukonis intends to do so. *See Palantir Techs., Inc. v. Jain*, No. 25 Civ. 8985, 2026 WL 622007, at *8 (S.D.N.Y. Mar. 5, 2026) (finding irreparable harm because an employee's downloading of internal company documents onto her personal devices the day of her resignation created a likelihood that the employee intended to utilize those the trade secrets in her new employment); *Intertek Testing Servs., N.A., Inc. v. Pennisi*, 443 F. Supp. 3d 303, 330 (E.D.N.Y. 2020) (finding irreparable harm where defendants returned their laptops to their former employer with certain information erased and emailed confidential information to their personal addresses); *Mercer Health & Benefits LLC v.*

[4] Andrukonis does not contest that she possesses trade secrets. *See generally* Opp.

*DiGregorio*, 307 F. Supp. 3d 326, 347 (S.D.N.Y. 2018) (finding irreparable harm where defendants met with a direct competitor while still employed by plaintiff and emailed confidential information to the competitor).

Instead, Sia Partners attempts to invoke the inevitable disclosure doctrine, "which dictates that risk of irreparable harm results from a situation in which a defendant possesses trade secret information and disclosure of those secrets is inevitable." *Palantir Techs.,* 2026 WL 622007, at *8. In determining whether to apply the inevitable disclosure doctrine, courts in this District examine the following factors: "(1) the extent to which the new employer is a direct competitor of the former employer; (2) whether the employee's new position is nearly identical to [her] old one, such that [s]he could not reasonably be expected to fulfill h[er] new job responsibilities without utilizing the trade secrets of h[er] former employer; (3) the extent to which the trade secrets at issue would be valuable to the new employer; and (4) the nature of the industry and its trade secrets." *Int'l Bus. Machines Corp. v. Papermaster*, No. 08 Civ. 9078, 2008 WL 4974508, at *7 (S.D.N.Y. Nov. 21, 2008). So as "not to abrogate the requirement of 'a clear showing' of 'actual and imminent' irreparable harm, [the inevitable disclosure doctrine] must be applied with great care." *Am. Airlines, Inc. v. Imhof*, 620 F. Supp. 2d 574, 582 (S.D.N.Y. 2009).

The Court declines to find that Andrukonis will inevitably disclose Sia Partners' trade secrets to Korn Ferry. Beginning with the first factor, it is not clear the degree to which Sia Partners and Korn Ferry are competing firms. Sia Partners characterizes itself as a "management consulting firm," Carreau Decl. ¶ 4, whereas it describes Korn Ferry as an "organizational consulting firm," *id.* ¶ 23. This difference is illustrated by Andrukonis' statement that Courtecuisse advised her that management consulting firms—such as "Deloitte, Accenture,

PwC, EY, MCG, Bain, or McKinsey"—would violate her restrictive covenants. Andrukonis Decl. ¶ 20. Furthermore, although Korn Ferry also "services a wide-variety of business sectors, including financial services, healthcare, life sciences, private equity, and technology," Carreau Decl. ¶ 23, Sia Partners does not claim that the two companies compete for the same clients within those sectors. Based on the record developed thus far in this litigation, the Court concludes that the two companies' core businesses are distinct albeit with some overlapping services.

Next the Court examines "the nature of the industry and its trade secrets." *Papermaster*, 2008 WL 4974508, at *7. The consulting industry is large and diffuse—there is no evidence that Sia Partners and Korn Ferry are locked in "head-to-head competition" with "global strategies for competing against the other." *Int'l Bus. Machines Corp. v. De Freitas Lima*, No. 20 Civ. 04573, 2020 WL 5261336, at *12 (S.D.N.Y. Sept. 3, 2020), *aff'd sub nom.*, 833 F. App'x 911 (2d Cir. 2021). Nor do the trade secrets which Andrukonis possesses amount to the type of highly technical intellectual property where this factor weighs heaviest. *See e.g., Papermaster*, 2008 WL 4974508, at *8 (finding inevitable disclosure where the defendant was "fully aware of many of IBM's most sensitive trade secrets" and had "worked for years with some of the crown jewels of IBM's technology" which had "been jealously guarded and promoted by IBM"); *Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 105 (3d Cir. 2010) (finding inevitable disclosure where an executive who left for a direct competitor "was one of only seven people who possessed all of the knowledge necessary to replicate independently Bimbo's popular line of Thomas' English Muffins, including the secret behind the muffins' unique 'nooks and crannies' texture").

Here, "[v]irtually none of the information alleged to constitute a trade secret was tightly guarded [within Sia Partners]." *Trautman*, 2021 WL 6619331, at *13. At most, Sia Partners points to Andrukonis' access to its password protected "HubSpot Database," which includes information about Sia Partners' "relationships with its clients, including relevant points of contact, [and] applicable terms and conditions of Sia Partners' provision of services."[5] Carreau Decl. ¶¶ 13–14. Sia Partners does not claim that access to this database is limited within the company. *Cf. Papermaster*, 2008 WL 4974508, at *8; *Botticella*, 613 F.3d at 105. Moreover, Sia Partners does not allege that Andrukonis downloaded or otherwise illicitly retained information found on HubSpot. Instead, Sia Partners presumes Andrukonis must have committed to memory some unspecified information from HubSpot that would be harmful if disclosed to Korn Ferry. This presents a problem for Sia Partners because naturally "if the details [in HubSpot] are voluminous and complex, the likelihood [of Andrukonis' retention of them] is small." *Imhof*, 620 F. Supp. 2d at 585. The nature of the consulting industry and the type of trade secrets Andrukonis was exposed to during her limited tenure at Sia Partners, coupled with Sia Partners "lack of detail as to what [Andrukonis] knows and its commercial importance," *id.* at 585, cuts against a finding of inevitable disclosure.

Lastly, with respect to the second and third factors of the inevitable disclosure doctrine, "(2) whether the employee's new position is nearly identical to h[er] old one, such that [s]he could not reasonably be expected to fulfill [her] new job responsibilities without utilizing the trade secrets of [her] former employer," and (3) "the extent to which the trade secrets at issue would be valuable to the new employer," both weigh against a finding for Sia Partners.

[5] Sia Partners also claims in passing that it could be harmed by Andrukonis' potential disclosure of its "pricing methods." *See* Mem. at 14. The Court finds this unavailing because in a competitive marketplace, like consulting, a competitor "would be bound to learn from the customers a great deal about the competitors and the prices and incentives they offer." *Imhof*, 620 F. Supp. 2d at 583.

*Papermaster*, 2008 WL 4974508, at *7 (citation omitted). "[I]t cannot be said as a matter of New York's inevitable disclosure standard . . . that the roles are 'nearly identical.'" *Trautman*, 2021 WL 6619331, at *14 (quoting *Lima*, 2020 WL 5261336, at *8).[6] Andrukonis was Sia Partners' Chief Strategy & Growth Officer for North America, a role that involved substantial internal strategic development and marketing, including "acceleration of cross selling between business units, managing Sia Partners' client roster and strategic prospects lists, assisting with the creation of future business units, orchestrating business events and conferences . . . accelerating business synergies with future acquisitions, planning and executing key commercial proposals, and developing new clients." Mem. at 5–6. In her current role as a Senior Partner in Korn Ferry's advisory practice, Andrukonis is retained "to help recent placements, successors and other executives at their companies to shape their talent and human capital strategies, using Korn Ferry's proprietary data and assessment tools." Andrukonis Decl. ¶ 26. Andrukonis' work at Korn Ferry is more client facing than her position with Sia Partners. Moreover, the Court is not persuaded that Andrukonis, a seasoned veteran of change management consulting, lacks the skillset necessary to "fulfill h[er] new job responsibilities without utilizing [Sia Partners'] trade secrets." *Papermaster*, 2008 WL 4974508, at *7. "The law of trade secrets . . . is not intended to stifle competition by protecting a firm against the loss of an employee whose value resides not in the secrets she will divulge to her new employer but in the experience and skill she will bring." *Trautman*, 2021 WL 6619331, at *9.[7] Finally, the Court finds that Sia Partners has not

---

[6] Even finding that the roles are nearly identical is not dispositive, when as here the plaintiff "has not pointed to specific information" that the former employee will surely use against it. *Imhof*, 620 F. Supp. 2d at 583; *see id.* at 585 (finding case for inevitable disclosure was "weak" despite employee moving from American Airlines to Delta Airlines for an "identical" job).

[7] Andrukonis may nonetheless have violated the RCA or Employment Letter, but that question is not yet before the Court.

shown how the trade secrets that "would now still be in [Andrukonis'] memory," *id.* at *17, would be of "valu[e] to [Korn Ferry]," *Papermaster*, 2008 WL 4974508, at *7.

In summary, Sia Partners presents no evidence that Andrukonis has disclosed any trade secrets, or attempted to retain any physical or digital copies of trade secrets directly prior to or after her resignation. Nor has Sia Partners provided the Court any specific details as to the specific information it believes Andrukonis has plausibly retained that, in the hands of Korn Ferry, could harm its business. Moreover, the Court further finds that Sia Partners has not shown that the "judicially disfavored" inevitable disclosure doctrine applies. *EarthWeb, Inc. v. Schlack*, 71 F. Supp. 2d 299, 310 (S.D.N.Y. 1999). The Court, therefore, holds that Sia Partners has not shown it is likely to suffer irreparable harm.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for a preliminary injunction is DENIED. The Court shall issue a subsequent order instructing the parties to file a joint letter and proposed case management plan by **December 18, 2027**.

SO ORDERED.

Dated: November 17, 2026
New York, New York

ANALISA TORRES
United States District Judge